❐ Original ❐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>Records and information associated with the cellular devices assigned call numbers 312-459-9431 (Subject Cell Phone 1) and 414-766-3794 (Subject Cell Phone 2), in the custody of T-Mobile, as further described in Attachment A | ) | Case No. 26-876M(NJ)<br>Matter No. 2026R00004 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ____________ District of ____________ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before 4/23/2026 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Honorable Nancy Joseph.

*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for 30 days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ____________.

Date and time issued: 4/9/2026 @ 2:36 p.m.

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

1. Records and information associated with the cellular device assigned call number 312-459-9431 (referred to herein and in Attachment B as the "**Subject Cell Phone 1**") and 414-766-3794 (referred to herein and in Attachment B as the "**Subject Cell Phone 2**") that is in the custody or control of T-Mobile (referred to herein and in Attachment B1 as the "Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054. **Subject Cell Phone 1** and **Subject Cell Phone 2** are collectively referred to herein as the **Subject Cell Phones.** The subscriber of **Subject Cell Phone 1** is unknown and is believed to be used by Djuan WILLIAMS. The subscriber of **Subject Cell Phone 2** is Scott WILLIAMS and is believed to used by Scott WILLIAMS.

2. **Subject Cell Phone 1**

3. **Subject Cell Phone 2**

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for the time period from March 1, 2026, to present:

   i. Names (including subscriber names, usernames, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Subject Cell Phone 1** and/or **Subject Cell Phone 2** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which **Subject Cell Phone 1** and/or **Subject Cell Phone 2** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with **Subject Cell Phone 1** and/or **Subject Cell Phone 2**.

a. Information about the location of **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **Subject Cell Phone 1** and/or **Subject Cell Phone 2** on the Service Provider's network or with such other reference points as may be reasonably available, and at

such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**III. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession with intent to distribute controlled substances, conspiracy to possess with the intent to distribute/distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843, committed by Scott WILLIAMS, Djuan WILLIAMS, Antonio WESLEY-CARTER, and other identified and unidentified subjects during the period of October 1, 2025, to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>Records and information associated with the cellular devices assigned call numbers 312-459-9431 (Subject Cell Phone 1) and 414-766-3794 (Subject Cell Phone 2), in the custody of T-Mobile, as further described in Attachment A | Case No. 26-876M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____________ District of ____________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☑ Delayed notice of 30 days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

PATRICK BECKMAN Digitally signed by PATRICK BECKMAN Date: 2026.04.08 09:25:09 -05'00'

*Applicant's signature*

Patrick Beckman, Special Agent DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 4/9/2026

Nancy Joseph

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Patrick Beckman, being duly sworn, hereby dispose and state as follows:

## INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers 312-459-9431 (**Subject Cell Phone 1**) and 414-766-3794 (**Subject Cell Phone 2**), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey. **Subject Cell Phone 1** and **Subject Cell Phone 2** are collectively referred to herein as "the **Subject Cell Phones**." The **Subject Cell Phones** are described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. The subscriber of **Subject Cell Phone 1** is unknown and I believe that it is currently being used by Djuan WILLIAMS. The subscriber of **Subject Cell Phone 2** is Scott WILLIAMS and I believe it is currently being used by Scott WILLIAMS.

2. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Subject Cell Phones**.

4. I am an investigator and law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

5. That your affiant is currently employed as a Special Agent with the Drug Enforcement Administration (DEA), Chicago Division, Milwaukee District Office. I was hired by the DEA in October of 2016, as a Special Agent. In November of 2016, I attended a 16-week Basic Agent Training Course at the DEA Academy located in Quantico, Virginia. Upon graduation from the DEA academy in March of 2017, I was assigned to the Chicago Division, Rockford Resident Office as a Special Agent tasked with investigating violations of state and federal drug trafficking laws. I transferred to the Green Bay Resident Office in September of 2022 and the Milwaukee District Office in 2025. Prior to my employment with the DEA, I served in the United States Marine Corps / Reserve from 2010 to 2015 and was a Trooper with the Illinois State Police from 2011 to

2016. I attended the Illinois State Police Academy located in Springfield Illinois from August of 2011 through March of 2012. Upon completion I was certified as a law enforcement officer in the State Of Illinois. My duties as a trooper included enforcement of the Illinois Compiled Statutes. This also included violations of the Illinois Controlled Substances Act. I attended Marquette University and graduated with a Bachelor of Arts degree with a major in International Affairs.

6. As part of my duties, I investigate criminal violations relating to narcotics trafficking and money laundering offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. By virtue of my employment as a Special Agent and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies, including Title III investigations.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments).

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and wireless telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

7. My knowledge of the facts and circumstances contained within this affidavit is based on my personal investigation, as well as reports made to me by other law enforcement agencies, including agents of the Drug Enforcement Administration, local city and/or county law enforcement, information obtained from governmental institutions, information obtained from non-governmental institutions, including banking institutions located in Wisconsin and elsewhere, and various other reports obtained under order or subpoena. The statements contained in this affidavit are based either on my personal knowledge or information obtained from other law enforcement officers and witnesses. Throughout this affidavit, reference will be made to case "agents." Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interview(s) and/or controlled buys with a confidential source (CS) whose reliability is established separately herein. This affidavit does not set forth every fact discerned throughout the investigation; rather, it contains a summary of the investigation to date and sets for the only those facts that I believe is necessary to establish the foundation for probable cause for an order authorizing the requested warrant.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that the users of the **Subject Cell Phones**, Scott WILLIAMS and Djuan WILLIAMS, and others, have violated, and are continuing to violate Title 21, United States Code, Sections 841(a)(1), 843(b), and 846 (hereinafter the TARGET OFFENSES). There is also probable cause to believe that the location information described in

Attachment B will constitute evidence of these criminal offenses and will lead to the identification of other individuals who are engaged in the commission of said offenses.

**PROBABLE CAUSE**

9. In the fall of 2025, the Drug Enforcement Administration (DEA) Milwaukee District Office initiated an investigation into Antonio WESLEY-CARTER. Said investigation subsequently revealed that WESLEY-CARTER is a large-scale distributor of various controlled substances to include cocaine, MDMA, and methamphetamine and that he employs others, including Scott WILLIAMS and Djuan WILLIAMS, to distribute drugs on his behalf.

10. Information was developed from a Confidential Source (CS) that identified WESLEY-CARTER as a kilogram quantity drug distributer in the Milwaukee, WI area. The CS relayed that WESLEY-CARTER utilized a specific number to facilitate drug transactions. The CS relayed that the CS knew this from prior drug transactions that occurred between the CS and WESLEY-CARTER prior to the CS's cooperation wherein the CS contacted WESLEY-CARTER at that number to arrange to purchase controlled substances. The CS was shown a photograph of WESLEY-CARTER and the CS identified the person in the photograph as the person from whom the CS purchased controlled substances.

11. Beginning in October of 2025, the CS made statements against the CS's penal interest. The CS has the following criminal convictions: disorderly conduct, possession of THC and drug paraphernalia. The CS has not been promised consideration for providing law enforcement with information on on-going criminal activity. Thus far,

the information provided by the CS has been corroborated by information known to case agents, as well as other law enforcement officials, gathered during the course of the CS's cooperation. The CS has provided information that has led to the seizure of controlled substances and the arrest of individuals. The CS also participated in at least two controlled buys. Following the buys, the CS was debriefed by case agents and the CS's versions of events were later corroborated by case agents' review of covertly recorded audio of the controlled buy transactions (as well as video of the first controlled buy). The CS has charged and pending felony drug charges and is cooperating with law enforcement in hopes of receiving judicial and prosecutorial consideration. Within the context of the information detailed and relied upon for purposes of this Affidavit, case agents believe that the CS is credible and the CS's information is reliable.

12. Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which a confidential source (CS) purchases controlled substances from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When a confidential source (CS) is used, the CS is searched for contraband, weapons, and money before the operation. The CS is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the CS meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The CS is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the CS while under the direction and control of case agents are recorded. The purchased controlled substances are then weighed and

field tested by case agents. To the extent that I refer to a controlled buy below, it was conducted in this manner unless otherwise noted.

**November 2025 Controlled Buy at 2743 N. 29th Street**

13. On or about November 18, 2025, the CS, at the direction of case agents, called WESLEY-CARTER's phone number in order to inquire about the purchase of cocaine. Following the phone call, the CS contacted case agents and relayed that the CS had spoken to WESLEY-CARTER and WESLEY-CARTER agreed to provide three ounces of cocaine to the CS for $2,100. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

14. On or about November 19, 2025, at the direction of case agents, the CS placed another call to WESLEY-CARTER's phone number. Following the phone call, the CS relayed that the CS had talked to WESLEY-CARTER and WESLEY-CARTER was ready for the drug transaction. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed, but it was not recorded or witnessed by case agents.

15. An additional phone call was placed to WESLEY-CARTER's phone number by the CS leading up to the drug transaction to confirm that WESLEY-CARTER would be ready to sell the CS cocaine. This phone call was recorded and witnessed by case agents. Case agents verified that this call was placed to WESLEY-CARTER's phone number by reviewing the CS's telephone and confirming the number that was dialed.

16. On November 19, 2025, in the afternoon, case agents met with the CS. The CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $2,250 of pre-recorded U.S. Currency as well as audio and video recording equipment. At approximately the same time, case agents established surveillance in the area of 2743 N. 29th Street in Milwaukee, Wisconsin. According to the CS, this address was previously utilized by the CS to meet with WESLEY-CARTER for drug transactions prior to the CS's cooperation with law enforcement.

17. Case agents maintained constant visual contact while the CS was enroute to 2743 N. 29th Street. Case agents observed the CS's vehicle park in front of 2743 N. 29th Street. After a short time, case agents observed the CS exit the CS's vehicle and enter 2743 N. 29th Street. After a short time, the CS exited 2743 N. 29th Street and got into the CS's vehicle and departed. Case agents maintained constant visual contact with the CS's vehicle while enroute to a predetermined meeting location. Case agents met with the CS at the predetermined meeting location. Case agents retrieved the audio and video recording equipment. The CS turned over a clear plastic bag containing a white chunky substance (suspected cocaine) to case agents. The CS also turned over $150 of pre recorded U.S. Currency. Case agents searched the CS's vehicle and the CS for contraband with negative results.

18. The CS then provided a statement about what occurred within 2743 N. 29th Street. The CS relayed that the CS had entered 2743 N. 29th Street and met with an older black male (later identified as Scott WILLIAMS). The older black male provided the

suspected cocaine to the CS and the CS provided $2,100 of pre-recorded U.S. Currency to the older black male. The CS relayed that the CS inquired as to the price of pills. The CS relayed that the older black male called an individual who the CS believed to be WESLEY-CARTER. The older black man then told the CS that the pills (ecstasy pills) were $70 a "jar" (a jar is 100 ecstasy pills). Initially, however, the older black male stated, "the blues" which I believe this to a be a reference to fentanyl pills. The CS clarified for the older black male that the CS was talking about ecstasy pills. The CS also relayed that the CS saw two plastic bags inside 2743 N. 29th Street near a window sill containing what the CS believed was cocaine.

19. The CS also relayed that upon getting into the CS's vehicle, the CS received a phone call from WESLEY-CARTER's phone number. This call was recorded. Case agents later confirmed this by viewing the call log of the CS's cell phone and observed an incoming call from WESLEY-CARTER's phone number at the approximate time that the CS was seen within the CS's vehicle. The CS relayed that the CS spoke to WESLEY-CARTER (via WESLEY-CARTER's phone number). WESLEY-CARTER clarified that the price for ecstasy pills was $650 for 1,000 pills. Based on my training and experience, I believe that this also confirms that the older black male in the residence contacted WESLEY-CARTER to inquire about the price of the pills requested by the CS. The CS also relayed that the older black male had provided drugs to the CS in the past on behalf of WESLEY-CARTER. This was prior to the CS's cooperation with law enforcement.

20. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the cocaine purchase and discussion regarding the pills. Case agents were able to see the older black male's face in the recording and subsequently identified him as Scott M. WILLIAMS. Case agents identified WILLIAMS as the older black male who provided the cocaine to the CS that the CS had ordered from WESLEY-CARTER.

21. Case agents field tested the suspected cocaine and it tested positive for the presumptive presence of cocaine. Case agents weighed the cocaine and it weighed approximately 90.3 grams.

**January 2026 Controlled Buy at 2511 W. Auer Avenue**

22. On or about January 26, 2026, case agents directed the CS to place a call to WESLEY-CARTER and inquire about purchasing "blues" (fentanyl pills) and "rollers" (ecstasy pills). This call was not recorded as the CS conducted the call prior to meeting with case agents. Case agents would later view the call log of the CS's device and confirm that the call had happened and confirmed that the CS was calling WESLEY-CARTER on WESLEY-CARTER's phone number. According to the CS: During the call, WESLEY-CARTER informed the CS that WESLEY-CARTER did not have any "blues," but stated to the CS that WESLEY-CARTER currently had the "rollers." After the CS spoke with WESLEY-CARTER, the CS immediately called case agents and notified them of the conversation. The CS further stated that during this call, WESLEY-CARTER told the CS that WESLEY-CARTER would provide a new location for the CS to travel to for

this purchase. During the time of the call between the CS and WESLEY-CARTER, case agents had been monitoring the GPS location being received on WESLEY-CARTER's phone number. Case agents observed that WESLEY-CARTER's phone number was currently in the area of 3858 N. 98th Street, Milwaukee, WI, which is the residence of WESLEY-CARTER.

23. On this same date, case agents then met with the CS at a predetermined location. During this meeting, the CS and CS's vehicle were searched for contraband and U.S. Currency with negative results. The CS was provided with $650 of pre-recorded U.S. Currency as well as audio and video recording equipment. Case agents also placed a GPS monitoring device inside the CS vehicle to monitor the CS vehicle's location in real time. At the direction of case agents, the CS departed the predetermined meeting location and was directly followed by case agents with a plan for the CS to travel towards 2743 N. 29th Street. Shortly after departing, the CS was directed by case agents to again call WESLEY-CARTER on WESLEY-CARTER's phone number with the purpose of obtaining a meeting location. This call was recorded, and during the call, WESLEY-CARTER informed the CS that WESLEY-CARTER would be ready to meet in approximately 20 minutes. The CS was not provided with a location at this time and continued traveling in the direction of 2743 N. 29th Street. Approximately 25 minutes after this call, the CS was again instructed to contact WESLEY-CARTER by calling WESLEY-CARTER's phone number. WESLEY-CARTER informed the CS to travel to 2511 W. Auer Avenue. This address was also sent via text message to the CS by WESLEY-CARTER from WESLEY-CARTER's phone number (as verified by case agents after

reviewing the CS's device). Case agents would later view this text message and download a copy of this message which was later placed into DEA evidence.

24. In anticipation of the controlled buy, case agents were monitoring location data for WESLEY-CARTER's phone number on January 26, 2026, and noted that WESLEY-CARTER's phone was not in the area of 2743 N. 29th Street. Therefore, case agents expected that the CS would again meet with an intermediary working with WESLEY-CARTER, as the CS did during the earlier buy on November 19, 2025.

25. Once the CS received the address information from WESLEY-CARTER, surveillance units were established in the area of 2511 W. Auer Avenue. However, out of an abundance of caution related to the surveillance consciousness of WESLEY-CARTER, case agents could not position themselves in a manner to see the front door of 2511 W. Auer Avenue. The CS was still being directly followed by case agents and was observed to turn eastbound on W. Auer Avenue from N. 27th Street. Case agents observed the GPS device placed in the CS vehicle show that the CS vehicle came to a stop directly in front of 2511 W. Auer Avenue. The location data obtained from this GPS device would later be downloaded and placed into DEA evidence. Case agents monitoring the cover audio recording device could overhear the CS exiting the CS vehicle and a short time later the CS could be heard talking to another person with a male voice. After a brief conversation, the CS could then be heard entering the CS vehicle and shutting the door. Shortly after, the GPS location data showed the CS vehicle to depart eastbound on W. Auer Ave at which time case agents observed the CS's vehicle turn southbound from W. Auer Ave onto N. 25th Street.

26. The CS vehicle was directly followed from this area by case agents back to a predetermined meeting location. The CS made no stops and interacted with no one from the time the CS departed the area of 2511 W. Auer Avenue until the CS was at the predetermined location. Once at this location, case agents retrieved the audio and video recording equipment and the GPS device from the CS vehicle. The CS and CS's vehicle were again searched for contraband with negative results. Case agents field tested the multicolored pills and received a presumptive positive test for the presence of MDMA. The pills weighed approximately 479 grams. However, based on the overall investigation, I believe these pills are methamphetamine.

27. The CS provided a statement to case agents as to what had occurred during this purchase: The CS parked the CS vehicle directly in front of 2511 W. Auer Avenue and then walked to the front door of the residence and walked inside. Once inside, a black male with a short haircut and goatee was standing inside already and the CS did not previously know this individual. This unknown black male was on a FaceTime phone call when the CS entered the residence. The black male showed the CS the phone and the CS observed that this unknown black male was on the phone with WESLEY-CARTER. The CS provided the unknown male with the $650 and the black male handed the CS two plastic bags filled with the multicolored pills.

28. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill purchase based upon what could be

heard on the recording. However, the video did not capture the black male in the residence.

29. Through the investigation, case agents became aware that WESLEY-CARTER was associated with Djuan L. WILLIAMS (DOB: XX/XX/1979). Case agents showed the CS an unlabeled photo of Djuan WILLIAMS and the CS immediately identified Djuan WILLIAMS as the unknown black male that had been inside 2511 W. Auer Avenue Street who was on the Facetime call with WESLEY-CARTER and who provided the CS with the pills.

**March 2026 Controlled Drug and Firearm Purchase at 2511 W. Auer Avenue**

30. On March 2, 2026, the CS met with case agents at a predetermined location. At that time, the CS and CS vehicle were searched for drugs, money, weapons, or other contraband with none located. The CS was given $1,300 prerecorded DEA buy money for the pills and $900 of prerecorded ATF buy money for the firearm. The CS was directed to place a recorded call to WESLEY-CARTER's phone number and let WESLEY-Carter know that the CS was ready for the buy. This call was recorded and case agents observed that the call was made to WESLEY-CARTER's phone number. During the call, WESLEY-Carter told the CS to "pull up" which the CS understood to mean that WESLEY-Carter was ready for the deal. Prior to departing the predetermined location, case agents established surveillance units in the area of 2511 W. Auer Avenue, Milwaukee, WI. As surveillance was being established, the CS departed the predetermined meeting location and was directly followed by case agents to 2511 W. Auer Avenue. At no time was the

CS out of view and the CS made no stops or interacted with anyone prior to arriving at 2511 W. Auer Avenue.

31. The CS vehicle was observed parking directly in front of 2511 W. Auer Avenue and the CS remained in the CS vehicle. Shortly after the CS was observed parking, case agents observed gray Volkswagen Atlas with Minnesota Plate SRJ495 traveling northbound on N. 26th Street from Auer Ave. Case agents have previously observed WESLEY-CARTER operating said vehicle. Shortly after, the Atlas was then observed traveling southbound on N. 25th Street towards Auer Ave, and the vehicle was ultimately observed to park directly behind 2511 W. Auer Avenue. Approximately five minutes after the Atlas observed parking, case agents observed Djuan WILLIAMS exit the front door of 2511 W. Auer Avenue. At that time, the CS was also observed exiting the CS vehicle and entering the front door of 2511 W. Auer Avenue**.** A short time after the CS entered 2511 W. Auer Avenue, case agents observed through remote video surveillance, a black male subject exit the rear door of 2511 W. Auer Avenue and walk to the Atlas. The black male opened the front passenger door for a moment, appeared to retrieve something, and then walk back inside 2511 W. Auer Avenue using the rear door to the residence. Comparisons were later made by viewing the covert recording devices and case agents were able to positively identify WESLEY-Carter as the black male that had been observed parking the Atlas and retrieving the object from the vehicle.

32. The CS ultimately was observed leaving through the front door of 2511 W. Auer Avenue. Djuan WILLIAMS and WESLEY-Carter were observed leaving at approximately the same time as the CS. WILLIAMS entered a silver in color Hyundai

Palisade, Wisconsin Plate AZS-2165 and WESLEY-Carter entered the Atlas and they both departed the area. Visual contact of the CS was briefly lost due to all parties leaving the residence at the same time. Visual surveillance was reestablished with the CS vehicle approximately 3 blocks from the residence. As case agents traveled southbound on N. 27th Street, the Atlas was observed traveling northbound on N. 27th and I clearly observed WESLEY-Carter to be the driver of the vehicle. I later reviewed the covert recording made by the CS of this buy and confirmed that during the brief time when the CS was out of view of case agents after departing the residence, the CS did not make any stops or interact with any other people.

33. Case agents met with the CS at a predetermined location at which time the CS provided a black plastic bag that contained approximately 20 smaller clear plastic baggies each containing approximately 100 multicolored suspected methamphetamine pills. The CS was searched at this time and no additional contraband was located, however the CS stated that the CS had left the handgun inside the CS vehicle for case agents to retrieve. Case agents then located a Glock 45 9mm handgun with a loaded magazine and round in the chamber inside the CS vehicle. The CS vehicle was searched at this time for additional contraband with none located.

34. The CS relayed to case agents that as the CS parked the CS vehicle in front of 2511 W. Auer Avenue, the CS waited in the CS vehicle until the CS saw a black male exit the front door and indicate to the CS to come inside. The CS stated that once inside 2511 W. Auer Avenue, the CS observed "Tone" and the black male to be inside. Case agents have positively identified "Tone" as Antonio WESLEY-Carter and the black

male has been previously positively identified as Djuan WILLIAMS. The CS stated that "Tone" (who I believe to be WESLEY-Carter) handed the CS the plastic bag containing the pills once the CS was inside the residence. The CS stated that they then observed that "Tone" (who I believe to be WESLEY-Carter) to be in possession of approximately 1,000 more of the same pills and he then placed these extra pills inside a cabinet near where he had been standing. The CS stated that that "Tone" (who I believe to be WESLEY-Carter) then exited the residence using the back door and was gone for a brief period of time. The CS stated that when that "Tone" (who I believe to be WESLEY-Carter) came back inside 2511 W. Auer Avenue, he had the handgun in his possession and then handed it to the CS. The CS stated that the CS had provided that "Tone" (who I believe to be WESLEY-Carter) with all $2,200 of prerecorded buy money for both the pills and the firearm and then departed 2511 W. Auer Avenue.

35. Case agents reviewed the covert recording made by the CS during the above-described controlled buy. Said recording was consistent with the CS's statement about what occurred concerning the pill and firearm purchase based upon what could be heard on the recording. Case agents were able to observe on the recording that Antonio WESLEY-Carter and Djuan WILLIAMS were both inside the residence and the video matched the statements made by the CS.

36. Case agents then transported the Gock 45 and suspected methamphetamine pills back to Milwaukee DEA for processing. The pills were subjected to a field test that yielded positive results for the presence of amphetamines and the pills had a weight of approximately 997.8 grams.

**March 26, 2026—Execution of Federal Search Warrants**

37. On March 26, 2026, case agents executed federal search warrants at WESLEY-CARTER's residence (3858 N. 98th Street), 2511 W. Auer Avenue residence, and the 2743 N. 29th Street residence. WESLEY-CARTER was arrested at 3858 N. 98th Street. Djuan WILLIAMS and Scott WILLIAMS were not located.

38. The search of **2511 W. Auer Avenue** revealed:

a. A plastic grocery bag containing several clear plastic baggies of multi-colored pills. This bag was located within the northeast bedroom on the floor. Within the same room, officers located mail identifiers for Wesley-Carter as well as license plates that were registered to him.

b. Approximately 294 grams of an unknown white/colorful powder found in the garage.

c. Approximately 58 grams of loose pills in the kitchen.

d. A Taurus model 63 semi-automatic handgun bearing serial number ABL178038. This firearm was located in a cabinet next to the fridge in the kitchen.

e. Numerous empty kilogram wrappers were located inside the residence. These empty wrappers were subjected to a field test and tested positive for the presence of cocaine.

f. An Anderson Manufacturing rifle bearing serial number 19277127. This firearm was located in the northwest bedroom on the floor next to the couch in a case.

39. The suspected methamphetamine pills recovered from the Auer Avenue residence weighed approximately 1638.1 grams.

40. The search of 2743 N. 29th Street revealed:

g. Multiple plastic grocery-style bags containing several clear plastic baggies of multi-colored pills. These bags were located within the master bedroom on the first floor of the residence underneath the bed. These pills were similar, though not identical to those found within the Auer Avenue residence.

h. Approximately 43 grams of an orange powdery substance was located in the second bedroom also located on the first floor of the residence and 27 grams of a white powder was located in this same bedroom. These substances will be lab tested but are suspected to be cutting agent.

41. The suspected methamphetamine pills recovered from the Auer Avenue residence weighed approximately 2261.4 grams.

42. The search of 3858 N. 98th Street revealed approximately 10 long guns and approximately 11 handguns as well as approximately $50,000 in cash (suspected drug proceeds).

**April 7, 2026, indictment of WESLEY-CARTER, Djuan WILLIAMS and Scott WILLIAMS**

43. On April 7, 2026, a Federal Grand Jury located in the Eastern District of Wisconsin returned a true bill indictment of WESLEY-CARTER, Djuan WILLIAMS and Scott WILLIAMS. They were charged with the following violations: Conspiracy to Distribute 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter, S. Williams, and D. Williams), distribution of cocaine (Wesley-Carter and

S. Williams), two counts of distribution of 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter and D. Williams), possession with the intent to distribute 500 grams or more of a mixture and substance containing methamphetamine (Wesley-Carter, S. Williams, and D. Williams), and possession of a firearm in furtherance of a drug trafficking offense (Wesley-Carter). A Federal arrest warrant was issued for Djuan WILLIAMS and Scott WILLIAMS. Said arrest warrants remain outstanding at this time.

**Cellular Phone information for Scott WILLIAMS and Djuan WILLIAMS**

44. An analysis of WESLEY-CARTER's telephone (414-336-1768) identified telephone number 312-459-9431 (**Subject Cell Phone 1**) as a top caller of WESLEY-CARTER. Subscriber information provided by T-Mobile provided no information (blank subscriber data) and an activation date of December 15, 2024. A search of open source databases showed that **Subject Cell Phone 1**is associated with Djuan WILLIAMS. Toll analysis showed that on March 26, 2026, **Subject Cell Phone 1**contacted a Milwaukee Police Department (MPD) Sergeant. On April 7, 2026, case agents contacted the MPD Sergeant regarding the phone call. The MPD Sergeant confirmed that **Subject Cell Phone 1**contacted him and additionally confirmed he knew that phone number to be utilized by Djuan WILLIAMS. Additionally, an analysis performed subsequent to a federally authorized search warrant showed that WESLEY-CARTER's Phone had **Subject Cell Phone 1**listed at "Bro Juan". I believe that **Subject Cell Phone 1**was and still is being utilized by Djuan WILLIAMS.

45. An analysis of WESLEY-CARTER's phone identified telephone number 414-766-3794 (**Subject Cell Phone 2**). Subscriber information provided by T-Mobile shows that **Subject Cell Phone 2**was subscribed to Scott Williams at 2743 N. 29th Street in Milwaukee, Wisconsin. Additionally, an analysis performed subsequent a federally authorized search warrant on WESLEY-CARTER's Phone listed **Subject Cell Phone 2**as "Unc Dump". I believe **Subject Cell Phone 2**was and still is being utilized by Scott WILLIAMS.

## CONCLUSION

46. Based upon the aforementioned facts detailing the use of the **Subject Cell Phones,** I believe that tracking the location of the **Subject Cell Phones** will allow case agents to identify the location of Scott WILLIAMS and Djuan WILLIAMS in order to arrest them. Additionally, this location information may provide details as to the new location of stash houses and or other unknown co-conspirators.

47. Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other subjects involved in criminal activity, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to distribute (or obtain) drugs. Based upon the facts in this affidavit, there is probable cause to believe that the user of the **Subject Cell Phones** (Scott WILLIAMS and Djuan WILLIAMS) are engaging in drug trafficking and is utilizing **Subject Cell Phone 1** and **Subject Cell Phone 2** to commit violations of the TARGET OFFENSES.

48. Based on all the forgoing, I submit that there is probable cause to believe that the users of **Subject Cell Phone 1** and **Subject Cell Phone 2**are engaged in the distribution of controlled substances, the use of a communication facility in furtherance of a drug trafficking offense, and conspiracy to distribute controlled substances (TARGET OFFENSES). I further believe that evidence of these offenses is likely to be found by tracking the locations of **Subject Cell Phone 1** and **Subject Cell Phone 2**.

49. An administrative subpoena was served to T-Mobile for the **Subject Cell Phones**. T-Mobile confirmed that they serviced the **Subject Cell Phones**. Additionally, T-Mobile provided details regarding the subscriber information. The subscriber information provided by T-Mobile showed that no subscriber was listed to **Subject Cell Phone 1** but that **Subject Cell Phone 2** was subscribed to Scott WILLIAMS**.**

50. In my training and experience, I have learned that T-Mobile ("Service Provider") is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers"

(i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

51. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of **Subject Cell Phone 1** and **Subject Cell Phone 2**including by initiating a signal to determine the location of **Subject Cell Phone 1** and **Subject Cell Phone 2**on T-Mobile network or with such other reference points as may be reasonably available.

**TECHNICAL BACKGROUND**

52. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower

closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

53. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **Subject Cell Phone 1** and **Subject Cell Phone 2**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

54. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell

towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **Subject Cell Phone 1** and **Subject Cell Phone 2** including by initiating a signal to determine the location of **Subject Cell Phone 1** and **Subject Cell Phone 2** on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

55. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by

pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

56. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user of **Subject Cell Phone 1** and **Subject Cell Phone 2** and may assist in the identification of co-conspirators and/or victims.

**AUTHORIZATION REQUEST**

57. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

58. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

59. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **Subject Cell Phone 1** and **Subject Cell Phone 2**on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

60. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **Subject Cell Phone 1** and **Subject Cell Phone 2**would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic

information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

61. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **Subject Cell Phone 1** and **Subject Cell Phone 2**outside of daytime hours.

62. I further request that the Court order all documents in support of this application, including the affidavit and search warrant, be sealed until further order by the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. I further request that the Court order any service provider, or their representatives, not to disclose the existence of this warrant or investigation unless ordered to do so by the Court.

## ATTACHMENT A

**Property to Be Searched**

1. Records and information associated with the cellular device assigned call number 312-459-9431 (referred to herein and in Attachment B as the "**Subject Cell Phone 1**") and 414-766-3794 (referred to herein and in Attachment B as the "**Subject Cell Phone 2**") that is in the custody or control of T-Mobile (referred to herein and in Attachment B1 as the "Service Provider") a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, 07054. **Subject Cell Phone 1** and **Subject Cell Phone 2** are collectively referred to herein as the **Subject Cell Phones.** The subscriber of **Subject Cell Phone 1** is unknown and is believed to be used by Djuan WILLIAMS. The subscriber of **Subject Cell Phone 2** is Scott WILLIAMS and is believed to used by Scott WILLIAMS.

2. **Subject Cell Phone 1**

3. **Subject Cell Phone 2**

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for the time period from March 1, 2026, to present:

i. Names (including subscriber names, usernames, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long-distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by **Subject Cell Phone 1** and/or **Subject Cell Phone 2** including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which **Subject Cell Phone 1** and/or **Subject Cell Phone 2** will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with **Subject Cell Phone 1** and/or **Subject Cell Phone 2**.

a. Information about the location of **Subject Cell Phone 1** and/or **Subject Cell Phone 2** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **Subject Cell Phone 1** and/or **Subject Cell Phone 2** on the Service Provider's network or with such other reference points as may be reasonably available, and at

such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**III. Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession with intent to distribute controlled substances, conspiracy to possess with the intent to distribute/distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843, committed by Scott WILLIAMS, Djuan WILLIAMS, Antonio WESLEY-CARTER, and other identified and unidentified subjects during the period of October 1, 2025, to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.